IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Allison May, | ) Civil Action No. 1:05-0752-MBS-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| City of North Augusta, | ) **REPORT AND RECOMMENDATION** |
| George M. Grkovic, in his individual | ) |
| capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, Allison May ("May"), is an employee of the City of North Augusta ("the City").
She filed her complaint on March 10, 2005, alleging gender discrimination, a sexually hostile work
environment, violation of her First Amendment right to freedom of speech, retaliation, and a
violation of the public policy of South Carolina against the City.[1]  She also alleges a civil conspiracy
in violation of South Carolina law against her supervisor, George M. "Skip" Grkovic ("Grkovic").
Defendants filed a motion for summary judgment on September 15, 2006.  May filed an opposition
memorandum on November 15, 2006.  The defendants filed a reply on November 27, 2006.

Standard for Summary Judgment

When no genuine issue of any material fact exists, summary judgment is appropriate.  Shealy
v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  The facts and inferences to be drawn from the
evidence must be viewed in the light most favorable to the non-moving party.  Id.  Courts take
special care when considering summary judgment in employment discrimination cases because
states of mind and motives are often crucial issues.  Ballinger v. North Carolina Agric. Extension

---

[1]Pretrial matters were referred to the undersigned pursuant to Local Rule 73.02(B)(2)(g),
D.S.C.

Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987).  This does not mean that summary judgment is never appropriate in these cases.  To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."  Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995).  Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial.  Baber, citing Celotex Corp., supra.  Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir.

2

1989), n.7.  Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

Facts

The facts, either undisputed, or according to the plaintiff as the non-moving party, with all reasonable inferences therefrom, to the extent supported by the record, are as follows:

1.  May is a female.

2.  In 1997, the City created a Department of Economic and Community Development ("the Department") whose function was to provide "planning, development regulation, code enforcement, and economic development activities." (Grkovic Dep. 4).

3.  Grkovic was hired as the Director of the Department (Id.).

4.  Initially, the City funded only two other positions in the Department, a secretary (later "Administrative Assistant") and a planner (Id. at 49; Pl. Dep. 20).

5.  May was hired in 1998 as "Senior Planner" although she had no prior experience as a planner.  Her experience lent itself to the Department's economic development function. (Pl. Dep. 16; Grkovic Dep. 53 and Ex. 1).

6.  May described her duties as including "residential site plan review, zoning compliance review, sign permits, ..., initiated a new website for the City...worked on various projects as assigned, ...research..., answered questions about zoning and questions from the public about zoning and set backs and things related to the zoning ordinance, (a)nd...worked...on the [City's] newsletter." (Pl. Dep. 16).

7.  Shortly after May was hired, her position was changed to Planner/Development Project Coordination, but her duties and salary remained the same. (Id. at 18).

8.    At relevant times:

   A.    Charles Martin ("Martin") was the City's Administrator and Grkovic's supervisor (Grkovic Dep. 4); and

   B.    Diana Miller ("Miller") was the City's Manager of Human Resources.

9.    Matthew Taylor ("Taylor") was hired as a Code Enforcement Officer in 2001 or 2002 (Pl. Dep. 26; Grkovic Dep. 105).

10.    Review of the record shows that Grkovic does not have a pleasing personality.  He is variously described as "dismissive" and "rude" (Pl. Dep. 85), "tough" (Miller Dep. 49), "difficult to work with" and a "task master" (Martin Dep. 12), demeaning and a "very strong personality" (Gilliland Dep. 37 and 40), "intimidating" and "critical" (Wegner Aff.), and "mean spirited" (Mims Aff.).

11.    May, and other women with whom Grkovic has worked, feel that he is biased toward women, demeans them, and treats them differently than male employees (Pl. Dep. 85-98; Gilliland[2] Dep. 37-44; Wegner Aff.; Mims Aff.).[3]

12.    According to Mims, she

   observed Mr. Grkovic on a continuing and almost daily basis perform a lewd and disgusting habit of placing his hands in and around his crouch (sic) area and manipulating the same.  He did this by placing his hands in the front of his parts in the crotch area or by placing his right hand in his pocket and appearing to "jiggle" his genitals.  He performed this act repeatedly in the presence of women as well as men and it was totally disgusting. (Mims Aff.).

   This conduct was confirmed by others (Pl. Dep. 89; Brit Dep. 17-18).

13.    May and Mims reported the conduct to Miller. (Pl. Dep. 89-90; Mims Aff.).

----

[2]Gilliland is a female but is not an employee of the City.  She worked with Grkovic in his position with a non-profit organization.

[3]Wegner and Mims are former employees of the City who were supervised by Grkovic.

14.    May reported her other difficulties with Grkovic to Miller on several occasions prior to September of 2003. (Pl. Dep. 85-86; Miller Dep. 48-49).

15.    As early as August 2002, Grkovic made a budget request to fund and hire a full time planner. (Pl. Dep. 27 and Dep. 105).

16.    On September 29, 2003, Grkovic issued a memorandum to May addressing performance issues.  He stated that the "quality of [May's] work in the review and approval of residential site plans and sign permits has been below what is expected and acceptable."  Grkovic cited specific errors concerning the approval of a residential swimming pool permit and a sign permit for a business.  Grkovic criticized May for "the manner in which you react to direction or suggestions I offer."   Last, Grkovic temporarily removed May's "job responsibilities in the areas of zoning and development regulation" and assigned them to Taylor.  Grkovic specifically instructed May not to discuss "this matter or other personnel issues with members of the department or city staff until we have fully discussed each issue." (Pl. Dep. 100-105; Pl. Dep. Ex. 6).

17.    May responded to Grkovic's memorandum on October 23, 2003. (Id.).

18.    The City uses a numerical system for annual evaluation of its employees ("MPA").  Under the MPA, a rating of 3 is defined as "meets expectations."   Rating of 4 means "exceeds expectations" and 5, the highest score, means "substantially exceeds expectations."  A rating of 2 is "below expectations" and 1 is "substantially below expectations."  The employee is rated in several categories using these numbers.  The numbers are then averaged to determine an "MPA Rating."  An employee who is rated 3 or higher is automatically entitled to a raise, i.e., an "MPA Salary Adjustment."

19. Grkovic has evaluated May on all of her annual performance appraisals (Pl. Dep., 5 and 73; Grkovic Dep. 58 and 130).

20. May received an MPA Rating above 3 on her first four annual appraisals (1999-2002).

21. On January 20, 2004, Grkovic evaluated May for 2003 giving her an MPA rating of 2.92. She did not receive a salary increase. (Pl. Dep. Ex. 2).

22. May responded with a "Request for Review and Revision of Performance Appraisal" on January 28, 2004, challenging specific aspects of her evaluation. Attached to her memorandum were testimonial letters she solicited from several department heads. (Grkovic Dep. 16).

23. Grkovic denied May's request for review and revision by memorandum of February 11, 2004. Grkovic also advised May that the temporary removal of her planning duties was permanent and provided her with a job description as "Development Project Coordinator." Further, Grkovic reprimanded May for inappropriate conduct and insubordination for soliciting testimonial letters because such action was contrary to his previous instruction not to discuss personnel matters with other city employees until she had discussed any issue with him. (Grkovic Dep., Ex. 17; Pl. Dep. 74).

24. May and Grkovic met with Miller after the evaluation (Grkovic Dep. 108; Miller Dep. 54-55).

25. Scott Sterling ("Sterling") was hired as Planner.

26. The Department recommended approval of a site plan for a Waffle House which was in close proximity to property owned by May. During the planning process, May told Sterling that she objected to the site plan. On the late afternoon before the Planning Commission met, May told Grkovic that she intended to speak against the proposed site plan.

6

27.     On August 19, 2004, May attended a meeting of the City's Planning Commission and spoke, as a private citizen, in opposition to a site plan for a Waffle House that had been recommended for approval by the Department. (Pl. Dep. Ex. 7).

28.     Grkovic sent May a memorandum on August 31, 2004, questioning her judgment for appearing before the Planning Commission and describing her actions as "inappropriate, unprofessional, and disrespectful to the Department." (Id.).

29.     May filed a charge of discrimination with the South Carolina Human Affairs Commission ("SCHAC") on September 8, 2004 (Def. Mem., 26).[4]

30.     May responded to Grkovic with a memorandum on September 9, 2004, explaining that her appearance was based on her First Amendment right as a private citizen and requesting him to "withdraw any negative reference from my personnel file relating to the assertion of my protected rights." (Id.).

31.     Grkovic responded with a memorandum on September 27 stating that his previous memorandum was not a reprimand but "related to the manner in which you chose to exercise those [First Amendment] rights, the level of knowledge you exhibited, and the degree of respect you showed for the department in making a presentation." (Id.).

32.     On November 30, 2004, Grkovic rated May's performance for that year, giving her an MPA rating of 2.88.  In the category of "Judgment" Grkovic rated May as "Below Expectations" and specifically stated that May "showed a significant lack of judgment in her appearance before the Planning Commission." (Pl. Dep. Ex. 3).  May did not receive a salary increase.

---

[4]The SCHAC charge is not a part of the record.

33.    Grkovic gave May an MPA rating of 3.12 on her 2005 evaluation and she received a salary increase.

### Discussion

A.    Disparate Treatment

May alleges that the City subjected her to disparate treatment because of her gender. Title VII makes it "an unlawful employment practice for an employer–(1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...or national origin." In a disparate treatment case, the plaintiff must prove that "but for" his race or national origin, he would not have been subjected to an adverse employment action. Holmes v. Bevilacqua, 794 F.2d 142 (4th Cir. 1986). A plaintiff can prove the defendant's discriminatory motive by two methods. First, the "plaintiff may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 729 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981)." EEOC v. Clay Printing Company, 955 F.2d 936 (4th Cir. 1992).

The McDonnell-Douglas proof scheme consists of three stages. First, the plaintiff must produce sufficient evidence to establish a prima facie case of discrimination. Generally, the plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was subjected to an adverse employment action; and (4) other employees who are not members of the protected class were treated more favorably. Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir.), cert. denied, 516 U.S. 870 (1995). If the plaintiff succeeds in submitting sufficient evidence to the Court to establish a prima facie case, the burden then shifts

8

to the defendant to articulate a legitimate non-discriminatory reason for the employment action taken. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). Once the defendant has satisfied its burden, it then shifts to plaintiff to prove that the proffered reason is merely a pretext for discrimination. Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994).

The City argues that May cannot establish a prima facie case of gender discrimination because the record shows that she was not performing her duties at an acceptable level and that she did not suffer an adverse employment action.

The undersigned concludes, in the light most favorable to May, that she suffered two adverse employment actions: (1) change in job duties and title and (2) 2003 and 2004 annual evaluations which deprived her of a merit based cost of living increase.

In Webster v. Rumsfield, 156 Fed.Appx. 571, 2005 WL 3229753, *7 (4th Cir. 2005), Judge Traxler summarized precedent on what constitutes an adverse employment action:

> "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment. Conduct short of ultimate employment decisions can constitute adverse employment action." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375-76 (4th Cir. 2004). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).
>
> Thus, a reassignment can "form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999). However, a mere change in an employee's job assignment, even if "less appealing to the employee, ...does not constitute adverse employment action." Booz-Allen, 368 F.3d at 376. "Absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." Id.

Under this standard, Grkovic's removal of planning duties and change of job title constitutes an adverse employment action. May's level of responsibility was dramatically changed when her planning duties were stripped and assigned to males, first Taylor then Sterling. Likewise, Grkovic's MPA ratings of May should be considered adverse employment actions because they resulted in the denial of a merit pay increase,[5] a deprivation of a benefit.

The City asserts that May was not performing her job duties in 2003 and 2004 which resulted in the poor performance evaluations and change of job title. Based on the record, the undersigned concludes that May has failed to establish this element of her prima facie case.

> (B)ecause a plaintiff must show by a preponderance of the evidence that he met the employer's legitimate job expectations to prove his prima facie case, the employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations.

> * * *

> Although on summary judgment an employer is free to assert that the job expectation has not been met, nothing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a question of fact) that the preferred "expectation" is not, in fact, legitimate at all. Thus, where application of the...expectation element of the prima facie case seems to preclude an otherwise meritorious claim, the plaintiff is free to demonstrate that the employer's...expectations are not, in fact, "legitimate."

Warch v. Ohio Casualty Insurance Co., 435 F.3d 510, 515-17 (4th Cir. 2006).

The City has provided evidence of its expectations of May and that she was not meeting those expectations in the form of the written performance evaluations. For 2003 and 2004 May was rated on the basis of knowledge of job, quality of work, quantity of work, dependability, attendance,

---

[5]Generally, a poor performance evaluation is not considered an adverse employment action. However, it may be an adverse employment action where it has a direct, tangible adverse consequence with respect to the employees. Nye v. Roberts, 2005 WL 1870027 (4th Cir. 2005) (unpublished) citing Speaks v. Missouri Dep't. of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000).

initiative and enthusiasm, judgment, cooperation, relationship with others, coordination of work, and safety and housekeeping. Each of these expectations was broken down into three subcategories, a total of 33 subcategories. Grkovic rated May on each expectation and subcategory with specific comment.

May does not assert that the City's expectations are not legitimate, but merely disagrees with Grkovic's rating. A major part of May's 2003 rating (and the removal of her planning duties) were the decisions she made regarding approval of the swimming pool and sign discussed above. In her responsive memorandum, May stated that her decision to approve the swimming pool was "an unfortunate misunderstanding," and her approval of the sign was a mistake. The 2003 performance evaluation reflected these performance errors.

May's disagreement with her performance evaluation is insufficient to defeat summary judgment. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) (employee's own testimony cannot establish a genuine issue of material fact as to whether the employer's legitimate expectations were met, because "it is the perception of the decision maker which is relevant" (internal quotation marks and citation omitted)). This holding also precludes May's argument that other department heads and employees of the City found no fault with her work. They did not supervise May and had no hand in management of the Department.

The City argues that even if May could establish a prima facie case of gender discrimination, it has articulated legitimate, non-discriminatory reasons for removing her duties as a planner and her poor performance evaluations. The reasons were planning errors and the MPA evaluation reviews.[6] May does not directly address the City's pretext argument, but instead lapses into a largely irrelevant

---

[6]In Warch, the Fourth Circuit recognized that an employer may use the same evidence at different stages of the McDonnell Douglas framework. 435 F.3d at 516.

argument about retaliation and a hostile work environment. (Pl. Mem. 9).  May has not shown that the reasons articulated by the City are a pretext for discrimination.

  B.  Hostile Work Environment/Sexual Harassment

    Title VII makes it unlawful for an employer to discriminate against an employee with respect to compensation, terms, conditions or privileges of employment on the basis of sex.  42 U.S.C. § 2000e-2(a).  This includes creating or allowing a hostile work environment based on gender.  Meritor Savings Bank v. Vinson, 477 U.S. 57, 73 (1986).  To prove a hostile work environment, the plaintiff must show: (1) that she was harassed because of her sex; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis exists for imputing liability to the employer.[7] Howard v. Winter, 446 F.3d 559, 565 (4th Cir. 2006); Ocheltree v. Scollon Products, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

  In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating that a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22(1993)).  Actionable sexual harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult."  Harris, 510 U.S. at 21.  Title VII does not reach "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex... [I]t forbids only

---

   [7]Since Grkovic was May's supervisor, his actions are attributable to the City.  Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 266 (4th Cir. 2001).

behavior so objectively offensive as to alter the 'conditions' of the victim's employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998), citing, Harris 510 U.S. at 21.

Among the circumstances examined are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. at 21."While we do not approve of [the employer's] apparent willingness to offend and provoke employees with his ambiguously sexual innuendos, Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Id. at 754; see also Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir.1995) ("The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women...It is not designed to purge the workplace of vulgarity.").

Defendants assert entitlement to summary judgment because none of the actions about which plaintiff complains were based on her gender, nor were those actions sufficiently severe or pervasive to create an abusive working environment. May does not specifically address this argument. (Pl. Mem., pp. 9-11).

An employee is harassed "because of" her gender if, "but for" her gender, she would not have been the victim of discrimination. Smith v. First Union National Bank, 202 F.3d 234, 242 (4th Cir. 2000); Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996); Miller v. Washington Workplace, Inc., 298 F. Supp. 2d 364 (E.D.Va. 2004); and Ensko v. Howard County, Md., 423 F. Supp. 2d 502, 508 (D.Md. 2006). A workplace filled by actions or remarks that intimidate, ridicule, and maliciously demean the status of women can create a hostile environment. Smith, 202 F.3d at 242. In Smith, plaintiff's supervisor, Scoggins, constantly "repeated remarks that belittled her because she was a woman." The Court summarized those remarks.

13

Scoggins' discriminatory remarks to Smith included the following: (1) Scoggins would have preferred a male in the team leader position because males are "natural leaders"; (2) Smith would "crack" because women "are not emotionally capable of handling the management role"; (3) Scoggins would frequently remark to Smith that a woman who was upset "must be menstruating" or that she needed "a good banging"; (4) women were "out to get him" and that women generally conspire with each other against men; (5) Scoggins wished he were a woman so that he could "whore his way through life"; (6) Smith was lucky to have her job, and she would not get any further at First Union because she was not attractive; (7) the "only way for a woman to get ahead at First Union is to spread her legs"; (8) women had no place in management and did not even belong in college; (9) women should be "barefoot and pregnant"; (10) women go through life looking for a man to marry; (11) Barbara Judge, a female supervisor, was "sleeping her way to the top" and therefore she was a "classic example of why women should not be in management"; (12) women's hormones do not allow them to handle work matters in a professional manner.

Smith, 202 F.3d at 243, n. 6.  The other cases cited above which found that the plaintiff was harassed because of her gender cite similar utterances.

In contrast, none of the memoranda written by May complain of sexual harassment. According to Miller, May's complaints to her involved poor communication (Miller Dep. 49-50). She testified, "I recall [May] talking about she couldn't do anything to please him, had a difficult time in communicating.  He wouldn't work with her, he wouldn't explain things, he would cut her off, be abrupt, that kind of thing." (Id. 73).  According to May, she complained about Grkovic to Miller prior to September of 2003[8] concerning "his treatment, his derogatory remarks, attitude, dismissive, rude, some peculiar habits that he has [i.e. groping], inability to do anything that meets his expectations...." (Pl. Dep. 85).  When specifically asked to identify derogatory remarks, May testified, "I would write something for the newsletter, and he would say did you spend five minutes

---

[8]After September of 2003, Miller's complaints centered upon poor evaluations and the aftermath.

on this..., and you know, just general demeanor, tone, attitude...." (Id. 86). The record contains no evidence that Grkovic ever used language that demeaned or objectified May as a woman.

Grkovic's "habit"[9] (Pl. Dep. 85) of groping himself gives one pause. Such an action could certainly be viewed as offensive. May testified that she observed the behavior on numerous occasions during the entire time of her employment. Also that it had been observed by others in the Department, men and women, and had been a topic of discussion. May also testified that Grkovic never made any comments related to this behavior, never made any gestures to her related to the behavior, and never made any facial expressions related to the behavior. (Pl. Dep. 89-91). When May complained to Miller about Grkovic's behavior, she did not say that she was being harassed, but that it made her "uncomfortable." (Miller Dep. 75). Thus, the undersigned concludes based on this record that while Grkovic's behavior was offensive, it was not directed at May, or any other female, because of gender.

Defendants also argue that the alleged conduct was not objectively severe or pervasive. May asserts that the work environment was objectively hostile, emphasizing that Grkovic could not get along with other females with whom he worked. May cites the affidavits of Grkovic's two former administrative assistants, Mims and Weger (Pl. Mem. 10). Weger was Grkovic's administrative assistant for five months. She had "interaction problems with Grkovic" and stated that "(h)e appeared to have a problem working with women." Weger described Grkovic as having an "intimidating and critical style" and giving "no positive feedback." She resigned because of the "hostile environment." (Weger Aff.).

---

[9]Phillis Britt described the habit as a nervous tick which she had observed in public forums and in Grkovic's office in the presence of both men and women.

A portion of the Mims' affidavit is quoted above. Mims' description of Grkovic is much like that of Weger. She states that she was Grkovic's Administrative Assistant for two or three years and that he "subjected [her] to an extremely hostile work environment." According to Mims, Grkovic "occasionally referred to her in negative and sometimes slanderous terms such as 'idiot' and once as a 'f...ing bitch.'" (Mims Aff.).

May does not assert that Grkovic talked to her in the manner in which he spoke to Mims. Further, May does not assert that she heard Grkovic say these things to Mims or any other female. As discussed above, there is no evidence that Grkovic used such remarks to belittle May because she was a woman.

May has shown that Grkovic was unpleasant but she has not shown that his conduct was objectively offensive based on her gender.

C.    Retaliation

May asserts that the removal of her planning duties, Grkovic's written reprimands, and her poor performance evaluations were in retaliation for her complaints to Miller and Martin concerning Grkovic.

To establish a prima facie case of retaliation, it must be demonstrated that:

(1)    the employee engaged in protected activity;

(2)    the employer took some adverse employment action against the employee; and

(3)    a causal connection existed between the protected activity and the adverse action.

See Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate,

16

non-retaliatory reason for the adverse action. Texas Dep't of Community Affairs v. Burdine, 450 U.S. at 254. If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual, and that the adverse action was imposed because the plaintiff engaged in protected activity. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).

A plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. Warren v. Halstead Industries, Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988) and Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

For the purpose of summary judgment, defendants concede that May engaged in protected activity when she spoke with Miller and Martin. Defendants contend that May cannot show that she suffered an adverse action or a causal connection between her protected activity and the employment decisions about which she complains.

The Fourth Circuit, in Von Gunten v. Maryland, 243 F.3d 858 (4th Cir. 2001), addressed what an "adverse employment action" is for purposes of a Title VII retaliation claim. Although "ultimate employment actions" are adverse employment actions, a Title VII retaliation claim does not require an ultimate employment action. In Burlington Northern & Santa Fe R.R. Co. v. White, ___ U.S. ___, 126 S.Ct. 2405, 2410 (2006), the Supreme Court held that a plaintiff is not required to show "an adverse effect on the 'terms, conditions, or benefits' of employment" to support a retaliation claim (quoting Von Gunten, 243 F.3d at 866). It is sufficient if the plaintiff shows that a reasonable employee finds the employment action "materially adverse" or likely to "dissuade a

17

reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  The undersigned concludes that the removal of May's planning duties and her negative performance evaluations were adverse employment actions.

However, the undersigned further concludes that May has failed to establish a causal connection.  May relies on temporal proximity to establish the required nexus.  The flaw in this argument is that May has not sufficiently established when she engaged in protected activity.

In Garrett v. Lujan, 799 F. Supp. 198 (D.D.C.1992), the court observed that "[w]hile a causal nexus is inferred when the adverse employment action occurs shortly after participation in a protected activity," such inference is not appropriate when the time interval is too great.  Id. at 202 (concluding that the passage of nearly a year precluded an inference of causal connection); see Parrott v. Cheney, 748 F. Supp. 312 (D.Md.1989) (even the passage of as little as five months between filing EEOC complaint and adverse action may be enough to negate causal connection in a particular factual context), aff'd per curiam, 914 F.2d 248 (4th Cir.1990).  The Fourth Circuit recognized these concepts in Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998):

> This Court has held that evidence that the alleged adverse action occurred shortly after the employer became aware of the protected activity is sufficient to "satisf[y] the less onerous burden of making a prima facie case of causa[tion]" Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989). We believe the opposite to be equally true. A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action, as was the case here, negates any inference that a causal connection exists between the two. See Burrus v. United Tel. Co., 683 F.2d 339, 343 (10th Cir.1982) (holding that three years between the protected activity and the adverse employment action was too long to establish the third element); Clark v. Chrysler Corp., 673 F.2d 921, 930 (7th Cir.1982) (holding that two-year time lapse negated any inference of causal connection). Indeed, were this not the case, an employee could guarantee his

job security simply by filing a frivolous complaint with the EEOC on his first
day of work. Title VII was not enacted to guarantee tenure in the workplace.

Generally, temporal evidence alone is insufficient to establish causation for completing a prima facie

cause of retaliation, unless the "temporal proximity between an employer's knowledge of the

protected activity and an adverse employment action" was "very close." Clark County School

District v. Breeden, 532 U.S. 268, 273 (2001).

May only testified that her protected activity occurred prior to September of 2003 when her

planning duties were removed. Thus, she has failed to establish causation based on temporal

proximity and a prima facie case of retaliation.

D.    First Amendment

May asserts that defendants retaliated against her in violation of 42 U.S.C. § 1983

because she exercised her First Amendment right to free speech. The speech in question is May's

appearance before the Planning Commission on August 19, 2004, in opposition to a site plan for a

Waffle House near her home.

Section 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage of any state..., subjects, or causes to be subjected, any citizen of the
> United States...to the deprivation of any rights...secured by the
> constitution...shall be liable to the party injured in an action at law....

The First Amendment to the Constitution guarantees freedom of speech. Citizens do not forfeit all

their First Amendment rights when they become public employees. Connick v. Myers, 461 U.S. 138

(1983) and Pickering v. Board of Educ., 391 U.S. 563 (1968). "(A) State may not discharge an

employee on a basis that infringes that employee's constitutionally protected interest in freedom of

speech." Rankin v. McPherson, 483 U.S. 378. 383 (1987). Whether a restriction imposed by an

employer on a public employee's speech violates the First Amendment requires a balance between

the employee's interest, as a citizen, in speaking on matters of public concern and the employer's interest in delivering its services to the public. Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000).

The primary issue is whether the speech in question was that of a private citizen commenting on a matter of public concern. If this is shown to be the case, the Court must then balance the employee's interest in First Amendment expression against the State's interest in maintaining proper operation of its workplace. Pickering, 391 U.S. at 568. The Court must examine the content, context, and form of the speech at issue in light of the entire record to determine whether the speech involves a matter of public concern. Urofsky, 216 F.3d at 406. Generally, speech that involves social, political, or other issues of interest to the community constitutes a matter of public concern. Id. It is recognized that speech by public employees made in the course of their job duties will frequently involve matters of public concern without giving those employees a First Amendment right to dictate to the employer how they will perform their job. Id.

To prevail on a First Amendment retaliation claim, a plaintiff must show that: (1) he engaged in protected speech on a matter of public concern; (2) his interest in First Amendment expression outweighs his employer's interest in efficient operation of the workplace; (3) he was deprived of some valuable benefit; and (4) a causal relationship exists between his protected speech on matters of public concern and the loss of the benefit. Huang v. Board of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990); McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998) and Peters v. Jenney, 327 F.3d 307, 322-33 (4th Cir. 2003).

For the purpose of their summary judgment motion, defendants concede that May spoke as a private citizen on a matter of public concern before the Planning Commission. (Def. Mem. 32). Defendants contend that May's expression does not outweigh the Department's interest in efficient

operation of the workplace, she was not deprived of a valuable benefit, and she cannot establish a causal nexus between her speech and any alleged retaliatory action.

In this Circuit, the "McVey test" is used in balancing the employee's interest in speaking on matters of public concern with the employer's interest in maintaining an effective and efficient workplace. Factors to be considered are the nature of the employee's position, the context of the employee's speech, and the extent to which it disrupts the Department's activity. McVey, 157 F.3d at 278. In considering these actors, the Court looks at whether the speech: (1) "impairs discipline by superiors"; (2) impairs "harmony among co-workers"; (3) "has a detrimental impact on close relationships"; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the [Department]; (7) is communicated to the public or to co-workers in private; (8) conflicts with the "responsibilities of the employee within the [Department]"; and (9) makes use of the "authority and public accountability the employee's role entails." Id. (quoting Rankin v. McPherson, 438 U.S. 378, 388-91 (1987)).

Defendants do not specifically discuss these factors, but make four points. First, the Department was undermined because May could have spoken internally instead of appearing before the Planning Commission. Second, her actions showed a lack of respect for Grkovic and the Department.[10] Third, defendants speculate that some members of the Planning Commission may have been confused because some of its members were aware that May was a member of the Department. Last, May gave the Planning Commission inaccurate information regarding development standards, i.e., the requirement for a buffer between commercial and residential

---

[10]These arguments relate to several of the factors cited above. However, May did speak internally to Sterling during the planning process.

property. (Def. Mem. 34). There is little evidence in the record with respect to any of the factors cited above.

Defendants argue that May cannot establish a causal nexus between her speech and a retaliatory action. (Id.). The actions in question are Grkovic's memorandum to May of August 31, 2004 (which May asserts in a written reprimand) and May's 2004 evaluation which rated her "Below Expectations" depriving her of a merit increase. Unquestionably, May's appearance before the Planning Commission was the "cause" of Grkovic's memorandum. Further, May's 2004 performance evaluation specifically gave her an adverse rating mentioning the Planning Commission appearance.

However, the undersigned concludes that May fails to show the deprivation of a valuable benefit. In the context of a retaliation claim, "a public employee employer contravenes a public employee's First Amendment rights when it discharges or 'refuses to rehire [the] employee,' or when it makes decisions relating to 'promotion, transfer, recall, and hiring based on the exercise of that employee's free speech rights.'" Ridpath v. Board of Governors Marshall Univ., 447 F.3d 292, 316 (4th Cir. 2006) quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000). In Suarez, the Court cited two cases as examples of de minimus retaliatory acts:

> courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights were the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands. See Benningfield v. City of Houston, 157 F.3d 369, 376-77 (5th Cir. 1998) (holing that employees "falsely accused" of criminal wrongdoing and "verbally reprimanded" by their employer failed to allege adverse employment actions sufficient to constitute retaliation), cert. denied, 526 U.S. 1065 (1999); Harrington v. Harris, 118 F.3d 359, 366 (5th Cir. 1997) (holding that an employer's criticism of employees and failure to award them merit pay increases did not constitute actionable adverse employment actions.).

May basically asserts that due to her appearance before the Planning Commission she was criticized and denied a merit pay increase. Under Suarez, these actions do not constitute retaliation in violation of her First Amendment rights.

       E.     Public Policy Discharge

      In Ludwick, the South Carolina Supreme Court established an exception to South Carolina's common law at-will employment doctrine. It held that "(w)here the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." Id. at 216. Ludwick involved an at-will employee who was discharged because she chose to honor a subpoena against her employer's wishes and testify before the South Carolina Employment Security Commission. The Ludwick exception is limited and "applies in cases when an employer requires an employee to violate the law or the reason for the employees termination was itself a violation of the criminal law." Lawson v. South Carolina Dep't. of Corr., 532 S.E.2d 259, 260-61 (S.C. 2000). With respect to the second part of the exception, S.C. Code Ann. § 16-17-560 provides that "(i)t is unlawful for a person to...discharge a citizen from employment...because of political opinions of the exercise of political rights and privileges guaranteed to every citizen by the Constitution and laws of the United States or by the Constitution and laws of this State." This statute "makes it a 'crime against public policy' to fire any person in this State because of their political beliefs." Culler v. Blue Ridge Elec. Co-op., Inc., 422 S.E.2d 91, 92 (S.C. 1992) (plaintiff discharged due to refusal to contribute to a political action committee has a wrongful discharge claim under Ludwick and S.C. Code Ann. § 16-17-560).

      The main problem with this claim is that May has not been terminated. She is still employed within the Department. She argues that "discrimination and retaliation are clear violations of public policy." (Pl. Mem. 13). While this may be true, May cites no cases which would stretch South

Carolina's public policy cause of action to any action other than termination based on the situation in <u>Ludwick</u> or because of political beliefs.

      F.    Civil Conspiracy

      May alleges that "(t)hroughout 2003 and 2004, the defendant Grkovic[11] met, planned, schemed and conspired with others, including city administrator Charles Martin, to implement an agenda to harass and threaten plaintiff and to take away and erode her responsibilities to cause her harm and ultimately to remove her from employment with the city." (Complaint ¶ 26). She further alleged that "(b)ecause of the positions of the conspirators with the city, special damages, proximately resulted." (Complaint ¶ 27).

      Under South Carolina law the tort of civil conspiracy has three essential elements: (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; and (3) causing plaintiff special damage. <u>Angus v. Burroughs & Chapin, Co.</u>, 628 S.E.2d 261, 262 (S.C. 2006). "In order to establish a conspiracy, evidence either direct or circumstantial, must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. Conspiracy may be inferred from the nature of the acts committed, the relationship of the parties, the interests of the alleged conspirators, and other relevant circumstances. Because civil conspiracy is by its very nature covert and clandestine, it is usually not provable by direct evidence." <u>Moore v. Weinberg</u>, ___ S.E.2d ___, 2007 WL 521944, *10 (S.C.Ct. App. 2007) (internal quotation marks and citations omitted).

      May has presented no evidence that Grkovic colluded with Martin or anyone else for the purpose of injuring her. In her memorandum, May merely repeats the allegation, quoted above, that

---

[11]Grkovic is sued in his individual capacity with respect to this claim.

Grkovic "met, planned, schemed and conspired with others." (Pl. Mem., 14). She cites no portion of the record as evidence to support the allegation. The only evidence in the record is that Grkovic, Martin and others performed their supervisory functions. See Pye v. Estate of Fox, 633 S.E.2d 505, 511-12 (S.C. 2006) (at summary judgment stage plaintiff has burden of producing evidence of an agreement between alleged conspirators to injure him).

Further, May has not pled or presented evidence of special damages. In connection with a civil conspiracy claim, a plaintiff must allege and prove special damages, i.e., damages that are directly attributable to the conspiracy itself, over and above to any damages alleged as a result of any other claims. Vaught v. Waites, 387 S.E.2d 91. 95 (S.C.Ct. App. 1989). "That is, the damages allegedly resulting from the conspiracy must not overlap with or be subsumed by the damages allegedly resulting from other claims." Parkman v. University of South Carolina, 44 Fed. Appx. 606, 2002 WL 1792098, *12 (D.S.C. 2002). *Accord* Holmes v. Donahoe, 2006 WL 859178, *2 (D.S.C. 2006).

With respect to her civil conspiracy claim, May alleges that she "has sustained a loss of earning capacity, all well as intangible damages, including embarrassment, humiliation and mental suffering, as well as reputational injury."[12] (Complaint ¶ 28). This allegation of damages merely repeats the allegations of damages for gender discrimination and retaliation. (Complaint, ¶ 15) and violation of First Amendment rights (Complaint, ¶ 21). Therefore, this claim must fail.[13]

---

[12]May also alleges entitlement to punitive damages from Grkovic "for his intentional and malicious actions."

[13]May does not discuss the requirement to plead and prove special damages in her memorandum. (Pl. Mem. 13-14). However, she alleges in her complaint that "(b)ecause of the positions of the conspirators with the city, special damages proximately resulted." (Complaint, ¶ 27). As discussed above, the relationship of the parties is a factor to be considered in showing the existence of the alleged conspiracy. May gives no clue as to how the existence of a

(continued...)

[13](...continued)
supervisor/employee relationship creates special damages.

## **Conclusion**

Based on a review of the record, it is recommended that defendants' motion for summary judgment be granted.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

June 11, 2007
Columbia, South Carolina